| | |
|---|---|
| 1 | Michael Cryan (SBN 249507) |
| 2 | Franjo M. Dolenac (SBN 259036)<br>**ARENT FOX LLP** |
| 3 | 555 West Fifth Street, 48th Floor<br>Los Angeles, CA 90013 |
| 4 | Telephone: 213.629.7400<br>Facsimile:  213.629.7401 |
| 5 | cryan.michael@arentfox.com<br>franjo.dolenac@arentfox.com |
| 6 | Attorneys for Plaintiffs |
| 7 | THE DUFFY 2004 LLC<br>and THE TULL 2006 LLC |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE DUFFY 2004 LLC and THE TULL 2006 LLC,<br><br>           Plaintiffs,<br><br>v.<br><br>AXA EQUITABLE LIFE INSURANCE COMPANY,<br><br>           Defendant. | Case No. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, the Duffy 2005 LLC and the Tull 2006 LLC, (collectively, "Plaintiffs"), by and through their attorneys, file this complaint against Defendant AXA Equitable Life Insurance Company ("AXA" or "Defendant"), and alleges as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this action seeking compensatory and punitive damages, equitable relief, and attorneys' fees based on AXA's unlawful increasing of the cost of insurance (sometimes referred to herein as "COI") rates on a targeted group of its in-force Athena Universal Life II ("AUL II") insurance policies (the "Policies"). This targeted group (the "Discriminated Group"), which includes Plaintiffs, consists of policyholders who own AUL II policies that (a) were issued on insureds who were 70 years old or older (issue age); and (b) have a face amount of $1,000,000 or more. By raising cost of insurance rates without a proper basis and only on the Discriminated Group, AXA has breached the express and implied terms of the Policies, not to mention violated laws prohibiting unlawful rate discrimination and unlawful, misleading, and unfair practices in connection with the marketing, selling, and administering of life insurance.

2. The claims made by Plaintiffs here are virtually identical to the claim made by another plaintiff before this court and the action, <u>EFG Bank AG v. AXA Equitable Life Insurance Company</u>, 2:16-CV-08103 (DSF). The claims by Plaintiffs herein, as well as EFG Bank there, are based on the same COI increase and premised on the same breach of contract and violation of law.

3. Where applicable, we have asserted the same allegations in this complaint as made by EFG for ease of reference and for issues of proof hereafter. We have not included all of the preliminary, factual pleadings that are set forth in great detail in the EFG complaint as those are not necessary to state the causes of action here, but we refer to that complaint for factual reference.

4. Although universal life insurance permits an insurer to adjust the cost of insurance rates (by increasing or decreasing the cost of insurance rates), the AUL II Policies restrict AXA's ability to change cost of insurance rates in two important ways. First, AXA may only change cost of insurance rates based on "reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses." Second, any change in cost of insurance rates must "be on a basis that is equitable to all policyholders of a given class."

5. The most important assumption in life insurance is mortality. Yet it is well-known in the life insurance industry that since AXA began issuing the Policies several years ago, in 2004, mortality has *improved*, not *worsened*. This improvement in mortality has resulted in new life insurance mortality tables that would, if anything, support a *decrease*, not increase, in cost of insurance rates. Despite this, AXA has *increased* cost of insurance rates, and it has done so by substantial amounts, in blatant breach of the Policies' express and implied terms and conditions.

6. Furthermore, the Policies state that any change in cost of insurance rates "will be on a basis that is equitable to all policyholders of a given class." But instead of implementing a rate increase that is equitable to policyholders in each class, AXA identified a new group of policyholders to be the target of its rate increase. That group is the Discriminated Group and consists solely of policyholders who own policies with issue ages of 70 and above and face amounts of $1,000,000 and above. Although AXA now refers to this group as a "class," upon information and belief, this so-called "class" did not exist at the time AXA designed the Policies and AXA only created it in a brazen attempt to circumvent the Policies' requirement that any rate increase be on a basis that is equitable to all policyholders of a given glass. In other words, knowing it could not treat policyholders within a class differently, AXA attempted to accomplish this result by simply redefining the classes themselves.

7. AXA also has attempted to justify its rate increase by claiming that low interest rates have resulted in lower than expected investment income for AXA. But even if this were true, low interest rates would impact all AUL II Policies, not just those with issue ages of 70 and above and face amounts of $1,000,000 and above, and there is no logical or actuarially-based reason for singling out these policyholders for a rate increase. Thus, it is apparent that AXA has targeted the Discriminated Group for reasons other than mere changes to its expectations of investment income.

8. Moreover, by drastically raising cost of insurance rates, it is apparent that AXA seeks to force Plaintiffs and other members of the Discriminated Group either to (a) pay exorbitant premiums that AXA knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their policies and forfeit the premiums they have paid to date, thereby depriving policyholders of the benefits of their policies. AXA, in turn, will make a huge profit – either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) and keeping the vast majority of the premiums that have been paid to date on them. Indeed, AXA stated in SEC filings from 2015 that it expected the cost of insurance rate increases on this subgroup of AUL II policyholders to result in a $46 million increase to net earnings in 2015 alone.

9. AXA's misconduct, as described more fully herein, constitutes not only express breaches of Plaintiff's policies, but also breaches of the implied and fair dealing and unlawful, unfair, and deceptive business practices. Plaintiff therefore seeks compensatory and punitive damages, as well as equitable relief and attorneys' fees.

## THE PARTIES

10. Each plaintiff is a limited liability corporation organized under the laws of the State of Washington and the managing member of each is the same entity, a separate Washington LLC with its principal place of business in California.

The policies currently owned by Plaintiffs were issued in the state of California to policy owners who resided in California at the time of issue.   All of the individual members of both Plaintiffs, and of the LLC members, are residents of California or Colorado.

11. Upon information and belief, Defendant AXA Equitable Life Insurance Company is a New York corporation with its principal place of business in New York, New York, and AXA is authorized to do business in the State of California and regularly conducts its business in the State of California, including within this judicial district.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the action involves parties of diverse citizenship, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. This Court has personal jurisdiction over AXA because AXA regularly conducts and transacts business in this state, including having issued the life insurance policies at issue in this state.

14. Venue is proper pursuant to 28 U.S.C. §§ 1391(a)(1), (a)(2), and 1391(b) because AXA resides in this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district, including AXA's issuance of the policies that are the subject of this complaint.

## FACTUAL BACKGROUND

**A.    Plaintiffs Are the Owners of AUL II Policies**

15. Each plaintiff is the owner and beneficiary of a policy that AXA issued in the State of California between 2004 and 2006. The Duffy policy is a $3 million policy issued on February 4, 2005.  The Toll policy is a $5 million policy issued on February 18, 2006.  The relevant terms and conditions of each policy are identical to those set forth in the Doe policy attached to the EFG complaint.

16. As is typical of universal life insurance policies, the AUL II Policies provide that they will remain in force as long as there are sufficient funds in the policy account each month to cover the monthly deductions described in the Policies. The monthly deductions consist of a premium charge, an administrative charge, and a cost of insurance charge, plus charges for any policy riders. Any balance in the policy account that is left after the deductions are taken reflects the "Policy Account Value," which accrues interest as provided for under the Policies. If in any month there are insufficient funds in the account to cover the deductions, the policy will enter a 30-day grace period. If additional premiums are not paid within the grace period, AXA will terminate, or lapse, the policy.

17. The largest and most significant charge under the Policies is the cost of insurance charge. This charge, also known as the mortality charge, reflects the price that AXA charges to cover the risk of death. The cost of insurance charge is determined by multiplying the cost of insurance rate times the net amount at risk. The net amount at risk is the death benefit minus the Policy Account Value. (The Policy Account Value is the savings component of a universal life insurance policy. It is deducted from the death benefit because the policyholder does not pay cost of insurance on this amount.)

18. The cost of insurance rates under a policy are based initially on certain characteristics of the insured, including her or his gender, age, and underwriting class (*i.e.*, preferred plus, preferred, standard, and substandard classes). The cost of insurance rate increases every year as the insured ages.

19. The Policies state that AXA "will determine cost of insurance rates from time to time" and that any change in the cost of insurance rates will be as described in the "Changes in Policy Cost Factors" provision. The "Changes in Policy Cost Factors" provision provides:

> Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis that is equitable to all policyholders of a given

class, and will be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses.

20. Accordingly, under the plain terms of the Policies, any change in the cost of insurance rates (a) can only be based on AXA's reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses; and (b) must be "equitable to all policyholders of a given class."

**B.     AXA Raises Cost of Insurance Rates Solely on the Discriminated Group's Policies**

21. In October 2015, AXA began notifying the Discriminated Group that it was raising the cost of insurance rates on their AUL II Policies, including all of the Plaintiff's Policies.  These letters stated that AXA was "adjusting your universal life insurance policy in a way that will increase the monthly cost-of-insurance (COI) deductions from your policy and which is likely to require payment of additional premium to help ensure that your policy will perform as previously illustrated."  The letters further stated that AXA has "reviewed our mortality and investment income expectations for Athena Universal Life II policies and [has] determined that they are less favorable than was anticipated when the current schedule of COI rates was established."

22. AXA's letters did not tell Plaintiffs how much the rate increase would be or explain how its mortality and investment income assumptions had changed. Nor did it say what policies or policyholders were subject to a rate increase.

23. Plaintiffs later calculated that the cost of insurance rate increase was between 35-65%. In addition, a FAQ that AXA released disclosed that the rate increase was targeted solely at the Discriminated Group, although it did not explain why AXA targeted this group exclusively.

24. AXA's rate increase breaches the terms of the Policies in at least four ways. First, the rate increase is not "equitable to all policyholders of a given class."

ARENT FOX LLP
ATTORNEYS AT LAW
WASHINGTON

Second, the rate increase is not "based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses." Third, the rate increase is excessive. Fourth, the rate increase breaches the implied covenant of good faith and fair dealing that exists in every insurance contract.

### C. The Rate Increase Is Not Equitable to All Policyholders in a Class

25. The only "class" referred to in the Policies is the "Rating Class." In the AUL II Product Guide that was attached as Exhibit 4 to the EFG complaint, which AXA distributed to its sales force, AXA refers to Rating Classes as "Underwriting Classes," but they appear to refer to the same grouping of policies.

26. The Underwriting Classes are (i) Preferred Plus Non-Tobacco User; (ii) Preferred Non-Tobacco User; (iii) Preferred Tobacco User; (iv) Standard Non-Tobacco User; (v) Standard Tobacco User; and (vi) Substandard letter rating classes C, D, E, and F, Non-Tobacco and Tobacco User. AUL II Product Guide, Exh. 4, p. 15. These classes represent a range of mortality risks, with Preferred Plus representing the lowest mortality risk to AXA.

27. Issue age and face amount are not characteristics of the Rating or Underwriting Class, although only certain issue ages qualify for a particular Underwriting Class. For example, Preferred Plus is limited only to issue ages of 18 to 80, while Preferred is available to anyone from age 0 to 85. Thus, the Preferred and Preferred Plus Underwriting Classes consist of policies with issue ages 70 and above as well as policies with issue ages 69 and below. These Underwriting Classes also consist of policies with face amounts of $1 million and above as well as policies with face amounts of $999,999 and below.

28. AXA's rate increase violates the provision that any change in cost of insurance rates be equitable to all policyholders within a class because the rate increase applies only to some members of an Underwriting Class (those with issue ages of 70 and above and face amounts of $1 million and above) and not to others. For example, some members of the Preferred and Preferred Plus rating classes

1  received a cost of insurance rate increase while others did not. The same holds true
2  for every other Rating or Underwriting Class.

3      29.    There also is no equitable or actuarial basis for singling out policies
4  with issue ages of 70 and above and face amounts of $1 million and above. This is
5  particularly true with respect to the alleged adverse changes in AXA's investment
6  income expectations. If, as AXA contends, it expects to receive less investment
7  income due to lower interest rates, it would expect to receive less investment
8  income for all policies regardless of their issue ages or face amounts. Indeed,
9  interest rates would have a greater impact on policies with *lower* issue ages, not
10 *higher* issue ages, because AXA would expect to realize the shortfall in expected
11 investment income over the course of many more years for policies with lower
12 issue ages. Thus, not surprisingly, the AUL II Product Guide expressly
13 acknowledges that interest rate assumptions have a greater impact on policies
14 issued to younger insureds. It states:

> Note that interest rates credited on a UL policy are *less important* in the sales illustration on a 75-year-old than they are on a 35-year-old since the illustration generally shows payments and policy values to age 120, (although the focus is often on age 100) and compounding over 85 years makes much more of a difference than over 45 years. ***Thus, there is relatively less interest rate risk on Athena II at older ages than at younger ages.***

20 AUL II Product Guide, Exh. 4, p. 1 (emphasis added).

21     30.    Nor does it appear based on A/E ratios that the AUL II Policies have
22 experienced worse mortality for policies with issue ages of 70 and above and face
23 amounts of $1 million and above. The A/E ratio is the actual to expected ratio, and
24 reflects an insurance company's actual experience compared to its expected
25 experience. Upon information and belief, AXA's A/E mortality ratios for policies
26 with issue ages of 70 and above and face amounts of $1 million and above is *lower*
27 *than* the A/E mortality ratios for policies with issue ages of 69 and below and face
28 amounts of $999,999 and less. In other words, upon information and belief, AXA's

mortality experience for the Discriminated Group has been more favorable than it has been for AXA's other AUL II Policies, which were not subject to the cost of insurance rate increase.

31. Thus, not only is AXA's rate increase not equitable to all policyholders within a given class, the rate increase appears to target a group of policies that have been ***more favorable to AXA*** than those that did not receive a rate increase. For this and other reasons, Plaintiffs believe that AXA had other undisclosed and improper motives for targeting the Discriminated Group for the rate increase.

32. Specifically, Plaintiffs are informed and believe, and on that basis allege, that AXA identified the Discriminated Group as consisting largely of investor policyholders that acquired their AUL II Policies in or through the secondary market for life insurance. Such policyholders, like Plaintiffs, have generally paid only enough premiums to cover their monthly policy charges and chosen not to invest in the AUL II policy account, which has resulted in less premium revenue for AXA and lower Policy Account Values. The Policies, however, do not permit AXA to raise cost of insurance rates based on Policy Account Values or how much policyholders choose to fund their policies. Indeed, by penalizing policyholders for exercising their contractual right to fund their policies as they choose, AXA has also breached the implied covenant of good faith and fair dealing.

**D. The Rate Increase Is Not Justified by Changes in Reasonable Assumptions as to Mortality and Investment Income**

33. The Policies state that AXA may base a change in cost of insurance rates only on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses. These are the only six assumptions that AXA may consider, and its assumptions must be reasonable. Furthermore, to

be based on AXA's reasonable assumptions, the changes in cost of insurance rates must correspond with the magnitude of the changes in AXA's assumptions.

34. Here, AXA has cited only two assumptions in support of the rate increase—mortality and investment income. Neither of these assumptions, however, supports AXA's rate increase.

**Mortality**

35. ***First***, as to mortality, it is well known in the life insurance industry that over the past decade, mortality has improved, not worsened, and people are living much longer than anticipated several years ago when AXA priced the AUL II Policies. This is evidenced by the release of several new mortality tables over the past two decades reflecting improved mortality that would, if anything, support a decrease in cost of insurance rates.

36. Specifically, in 2001, the Society of Actuaries' ("SOA") and the American Academy of Actuaries ("AAA") produced the 2001 Commissioner's Standard Ordinary ("CSO") Table, which revised the previous 1980 CSO Table to reflect significant improving mortality, especially at older ages. The maximum cost of insurance rates allowed under the AUL II Policies, however, are based on the older 1980 CSO Table, not the newer 2001 CSO Table. The SOA also is currently investigating an update of the 2001 CSO Table, and a 2015 investigative report by the SOA showed significant reductions in insurance company reserves compared to the 2001 CSO Table due to mortality improvements since 2001. In addition, in 2008, just four years after AXA priced the AUL II Policies, the SOA released a 2008 Valuation Basic Table that reflected significant mortality improvements compared to prior tables, especially at older ages. These new mortality tables demonstrate that since 2004 when the AUL II Policies were originally priced, mortality has improved, not worsened, and this change in mortality would support a ***decrease***, not increase, in cost of insurance rates.

37. Plaintiffs also are informed and believe, and on that basis allege, that AXA adjusted the cost of insurance rates for universal life insurance at least five times between 2004 and 2013, updating its mortality assumptions as needed, and AXA never disclosed during this time that it had suffered adverse mortality, justifying a change in cost of insurance rates on its in-force AUL II Policies. Indeed, upon information and belief, as late as February 25, 2015, AXA represented to NYDFS that its current experience for factors underlying any nonguaranteed elements, including mortality, was not different from its anticipated experience. Yet just seven months later, AXA purported to have discovered adverse mortality experience justifying a cost of insurance rate increase of as much as 65%. This is simply implausible.

**Investment Income**

38. *Second*, as to investment income, AXA likewise represented to NYDFS as late as February 25, 2015 that its current experience for factors underlying any nonguaranteed elements, including investment income, was not different from its anticipated experience, and it is highly implausible that AXA only discovered an adverse change in investment income just seven months later when it notified the Discriminated Group it was raising their cost of insurance rates.

39. In any event, even if lower interest rates have resulted in lower yields on AXA's investments, this would not justify a cost of insurance rate increase in the range of 35% to 65%, which is the range of the increases that Plaintiffs have calculated on the Plaintiff Policies. Interest rates should be a relatively minor factor in determining cost of insurance rates, particularly because any shortfall resulting from changes in interest rates (a) can be offset by lowering the credited rate on the Policies, which is the interest rate that AXA pays on Policy Account Values; and (b) can and must be distributed *equitably* among all policyholders, as discussed above.

40. Moreover, to the extent AXA experienced favorable mortality, the impact of such favorable mortality experience should offset any costs associated with lower than expected interest rates.

41. In sum, by drastically raising cost of insurance rates only on the Discriminated Group, AXA seeks to force Plaintiffs and other members of the Discriminated Group either to (a) pay exorbitant premiums that AXA knows would no longer justify the ultimate death benefits or (b) lapse or surrender their policies, thereby forfeiting the premiums they have paid over the last decade plus. AXA, in turn, will make a huge profit – either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) and keeping the premiums that have been paid to date. Indeed, AXA stated in SEC filings from 2015 that it expected the cost of insurance rate increases on this subgroup of AUL II policyholders to result in a $46 million increase to net earnings in 2015 alone.

## COUNT I

### (Breach of Contract – Express)

42. Plaintiffs reallege the allegations contained in paragraphs 1 through 41, inclusive, as if set forth fully herein.

43. Plaintiffs' Policies are binding and enforceable contracts.

44. Defendant materially breached Plaintiffs' policies in several respects, including but not limited to the following:

    a. By increasing the cost of insurance rates on a basis that is not equitable to all policyholders in a given class and instead specifically targeting the Discriminatory Group;

    b. By increasing the cost of insurance rates on a basis other than "reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses"; and

    c. By imposing excessive cost of insurance rates.

45. Plaintiffs have performed all of their obligations under the policies, except to the extent that their obligations have been excused by Defendant's conduct as alleged herein.

46. As a direct and proximate cause of Defendant's material breaches of the Policies, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.

## COUNT II

### (Implied Covenant of Good Faith and Fair Dealing – Contractual & Tortious Breach)

47. Plaintiffs reallege the allegations contained in paragraphs 1 through 41, inclusive, as if set forth fully herein.

48. Plaintiffs' policies are binding and enforceable contracts.

49. Each of the policies includes an implied covenant that Defendant will act in good faith and deal fairly with Plaintiffs.

50. Defendant materially breached the policies in several respects, including but not limited to the following:

    a. By charging excessive cost of insurance rates, thereby denying Plaintiffs the benefit of its actual policy account values;

    b. By increasing the cost of insurance rates on policyholders who exercised their contractual right to pay only enough premiums to cover a policy's monthly charges and, in effect, penalizing policyholders for and deterring policyholders from exercising their contractual rights, thereby frustrating their right to one of the essential benefits of their policies;

    c. By targeting Plaintiffs and the Discriminated Group for the cost of insurance rate increase when there is no reasonable actuarial basis for doing so;

    d.    By attempting to force Plaintiffs and other members of the Discriminated Group either to (a) pay exorbitant premiums that AXA knows would no longer justify the ultimate death benefits or (b) lapse or surrender their policies, thereby forfeiting the premiums they have paid to date; and

    e.    Failing to provide any meaningful disclosures about the cost of insurance rate increases, including refusing to provide or make available the documents that Defendant contends support its alleged bases for raising the cost of insurance rates.

51. Plaintiffs have performed all of their obligations under the policies, except to the extent that their obligations have been excused by Defendant's conduct as alleged herein.

52. Defendant's breaches were conscious and deliberate acts, which were designed to and which did unfairly frustrate the agreed common purposes of the Plaintiffs' policies and which disappointed Plaintiffs' reasonable expectations by denying Plaintiffs the benefits of the policies.

53. As a direct and proximate cause of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest. Furthermore, AXA's conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

## COUNT III

### (Declaratory Relief)

54. Plaintiffs reallege the allegations contained in paragraphs 1 through 41, inclusive, as if set forth fully herein.

55. For reasons including, but not limited to, those stated herein, there exists an actual dispute and controversy between Plaintiffs and Defendant

concerning Plaintiffs' rights and Defendant's obligations under the policies, including but not limited to how Defendant must implement any change in the cost of insurance rates and under what circumstances Defendant may change the cost of insurance rates.

56. Accordingly, Plaintiffs seek a declaration (a) that Defendant's cost of insurance rate increase is improper under the Policies and that any excess premiums received must be returned or the policies' account values recalculated according to the original cost of insurance rates; (b) that Defendant's purported "class" of policies defined by issue age and face amount are improper classes; and (c) setting forth the specific guidelines that govern the factual circumstances under which Defendant can raise the cost of insurance rates.

57. Such a declaration will help prevent or limit any future controversies under the Policies by providing guidance as to when and how Defendant can change the cost of insurance rates on its in-force AUL II Policies.

## COUNT IV
### (For Violation of Cal. Bus. & Prof. Code § 17200)

58. Plaintiffs reallege the allegations contained in paragraphs 1 through 41, inclusive, as if set forth fully herein.

59. California Business & Professions Code section 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."

60. Defendant has engaged in unlawful, unfair, and fraudulent business acts and practices, as described in detail herein.

61. As a direct and proximate cause of Defendant's unlawful, unfair, and fraudulent business acts and practices, Plaintiffs have lost money or property in the form of excess premiums paid to Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

**On the First Count**

1. For compensatory damages in an amount to be determined at trial;

2. For an award of pre-judgment and post-judgment interest;

3. For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4. For such other and further relief as the Court may deem proper.

**On the Second Count**

1. For compensatory damages in an amount to be determined at trial;

2. For punitive damages in an amount to be determined at trial;

3. For an award of pre-judgment and post-judgment interest;

4. For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

5. For such other and further relief as the Court may deem proper.

**On the Third Count**

1. For a declaration (a) that Defendant's cost of insurance rate increase is improper under the Policies and that any excess premiums received must be returned or the policies' account values recalculated according to the original cost of insurance rates; (b) that Defendant's purported "class" of policies defined by issue age and face amount are improper classes; and (c) setting forth the specific guidelines that govern the factual circumstances under which Defendant can raise the cost of insurance rates;

2. For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

3. For such other and further relief as the Court may deem proper.

**On the Fourth Count**

1. For an order requiring Defendant to return all excess premiums paid on Plaintiffs' policies and prohibiting Defendant from implementing the cost of insurance rate increase;

1      2.    For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

3      3.    For such other and further relief as the Court may deem proper.

Dated: February 7, 2017

Respectfully submitted,

ARENT FOX LLP

By: */s/ Franjo M. Dolenac*
    Michael Cryan
    Franjo M. Dolenac

Attorneys for Plaintiffs
THE DUFFY 2004 LLC
and THE TULL 2006 LLC

1 | **DEMAND FOR JURY TRIAL**

2 Plaintiffs hereby demand trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: February 7, 2017

Respectfully submitted,

ARENT FOX LLP

By: */s/ Franjo M. Dolenac*
Michael Cryan
Franjo M. Dolenac

Attorneys for Plaintiffs
THE DUFFY 2004 LLC
and THE TULL 2006 LLC