1
2
3
4
5

Michael Cryan (SBN 249507)
Franjo M. Dolenac (SBN 259036)
**ARENT FOX LLP**
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
Telephone: 213.629.7400
Facsimile: 213.629.7401
cryan.michael@arentfox.com
franjo.dolenac@arentfox.com

6
7

Attorneys for Plaintiffs
THE DUFFY 2004 LLC
and THE TULL 2006 LLC

8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17
18
19
20

THE DUFFY 2004 LLC and THE
TULL 2006 LLC,

             Plaintiffs,

v.

AXA EQUITABLE LIFE
INSURANCE COMPANY,

             Defendant.

Case No. 2:17-cv-00996-DSF-RAO

**FIRST AMENDED COMPLAINT**

**1.  BREACH OF CONTRACT;**

**2.  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (CONTRACTUAL);**

**3.  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (TORTIOUS); AND**

**4.  DECLARATORY RELIEF**

**JURY TRIAL DEMANDED**

21
22
23
24
25
26
27
28

Plaintiffs, the Duffy 2005 LLC ("Duffy") and the Tull 2006 LLC ("Tull," and together with Duffy, the "Plaintiffs"), by and through their attorneys, file this complaint against Defendant AXA Equitable Life Insurance Company ("AXA" or "Defendant"), and alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action seeking compensatory and punitive damages, equitable relief, and attorneys' fees based on AXA's unlawful increasing of the cost of insurance (sometimes referred to herein as "COI") rates on a targeted group of its in-force Athena Universal Life II ("AUL II") insurance policies (the "AUL II Policies"). This targeted group (the "Discriminated Group"), which includes Plaintiffs, consists of policyholders who own AUL II policies that (a) were issued on insureds who were 70 years old or older (issue age); and (b) have a face amount of $1,000,000 or more. By raising cost of insurance rates without a proper basis and only on the Discriminated Group, AXA has breached the express and implied terms of the AUL II Policies.

2.      The claims made by Plaintiffs here are virtually identical to the claim made by another plaintiff before this court and the action, <u>EFG Bank AG v. AXA Equitable Life Insurance Company</u>, 2:16-CV-08103 (DSF).  The claims by Plaintiffs herein, as well as EFG Bank there, are based on the same COI increase and premised on the same breach of contract and violation of law.

3.      The AUL II Policies are universal life insurance policies.  Universal life insurance is a form of life insurance also known as "flexible premium" adjustable life insurance.  Universal life insurance consists of two distinct components: (1) the life insurance component, for which the insurance company charges a cost to cover the risk of the insured's death (the cost of insurance); and (2) a savings component, where premiums paid in excess of the cost of insurance (and certain other policy changes) accumulate and earn interest at a rate that will not be lower than a guaranteed minimum crediting rate.

4.     Universal life insurance is designed to give policyholders flexibility, particularly with respect to the payment of premiums. This can be demonstrated by comparing universal life insurance to whole life insurance. With whole life insurance, a policyholder pays fixed monthly premium payments for the life of a policy. These fixed monthly premium payments include an amount associated with the cost of actual insurance (i.e., the cost for the insurance company to bear the risk of the insured's death) but also an additional amount intended to build up a "cash value" that earns interest over time. In the insured's earlier years, the fixed monthly premium payments are typically far higher than the insured's actual risk of death, and most of the premiums are used to accumulate cash value that will be used to fund the death benefit in the later years of the insured's life, when the fixed monthly premiums are likely to be lower than the actual risk of death. That is, the "cash value" build-up in the earlier years operates as a "reserve" to pay the death benefit in the later years.

5.     Universal life insurance "unbundles" these two components of a whole life insurance policy and allows policyholders to choose whether to pay just enough premiums to cover the risk of death (i.e., pay solely for the life insurance) or pay more (subject to certain limitations) and build up a cash value that earns tax-deferred interest (which, among other things, can be used to pay for the cost of insurance in the future).

6.     Although there is no fixed monthly premium payment that is due, if the balance in the policy account is insufficient to cover the policy's monthly charges, which includes the cost of insurance and certain other policy charges, the policy will enter a grace period and lapse unless additional premiums are paid.

7.     Universal life insurance policies have both guaranteed and non-guaranteed elements. Guaranteed elements are fixed and determined at a specific time, such as when the policy was issued. Non-guaranteed elements, on the other hand, are not fixed at a specific time and can be adjusted by the life insurance

company under the terms of the policy. An example of a guaranteed element is the guaranteed minimum crediting rate. An example of a non-guaranteed element is the cost of insurance rate, which is the rate that AXA charges to bear the risk of the insured's death. (Many universal life insurance policies refer to this as the "cost of insurance" rate because it is the rate that the insurance company charges purely for insurance coverage.)

8.      Although the AUL II Policies permit AXA to adjust the cost of insurance rates (by increasing or decreasing them), the AUL II Policies restrict AXA's ability to do so in at least three important ways. First, AXA may only change cost of insurance rates based on "reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses." Second, any change in cost of insurance rates must "be on a basis that is equitable to all policyholders of a given class."  Third, any change by AXA in the cost of insurance rates cannot "result in an interest crediting rate that is lower than that guaranteed in the policy."

9.      The most important assumption in life insurance is mortality. Yet it is well-known in the life insurance industry that since AXA began issuing the AUL II Policies several years ago, in 2004, mortality has *improved*, not *worsened*. Indeed, in 2015, the same year AXA announced it would be raising the cost of insurance rates, the National Center for Health Statistics reported that mortality had improved by 16.6% between 2000 and 2014.[1] The improvement in mortality has resulted in new life insurance mortality tables that would, if anything, support a *decrease*, not increase, in cost of insurance rates. Despite this, AXA has *increased* cost of insurance rates, and it has done so by as much as 68%, in blatant breach of the AUL II Policies' express and implied terms and conditions.

---

[1] Sherry L. Murphy, et al., *Mortality in the United States*, 2014, NCHS Data Brief No. 229, 5 (Dec. 2015).

14.     AXA also has attempted to justify its rate increase by claiming that low interest rates have resulted in lower than expected investment income for AXA. But even if this were true, low interest rates would impact all AUL II Policies, not just those with issue ages of 70 and above and face amounts of $1,000,000 and above, and there is no logical or actuarially-based reason for singling out these policyholders for a rate increase. Furthermore, lower investment returns should not justify a rate increase as high as 68%.

10.     Furthermore, the AUL II Policies state that any change in cost of insurance rates "will be on a basis that is equitable to all policyholders of a given class." But instead of implementing a rate increase that is equitable to policyholders in each class, AXA identified a new group of policyholders to be the target of its rate increase. That group is the Discriminated Group and consists solely of policyholders who own policies with issue ages of 70 and above and face amounts of $1,000,000 and above. Although AXA now refers to this group as a "class," upon information and belief, this so-called "class" did not exist at the time AXA designed the AUL II Policies and AXA only created it in a brazen attempt to circumvent the AUL II Policies' requirement that any rate increase be on a basis that is equitable to all policyholders of a given glass. In other words, knowing it could not treat policyholders within a class differently, AXA attempted to accomplish this result by simply redefining the classes themselves.

11.     Moreover, by drastically raising cost of insurance rates by as much as 68% on only the Discriminated Group, it is apparent that AXA seeks to force Plaintiffs and other members of the Discriminated Group either to (a) pay exorbitant premiums that AXA knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their AUL II Policies and forfeit the premiums they have paid to date, thereby depriving policyholders of the benefits of their policies. AXA, in turn, will make a huge profit—either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders)

1   and keeping the vast majority of the premiums that have been paid to date on them.

2   Indeed, AXA stated in its Form 10-K filed with the Securities and Exchange

3   Commission ("SEC") that it expected its rate increase to result in a $46 million

4   increase to net earnings in 2015 alone.  Later, however, AXA reported that it had

5   realized this $46 million increase in just the first nine months of 2015.

6        12.    AXA's misconduct, as described more fully herein, constitutes not

7   only express breaches of the AUL II Policies, but also breaches of the implied and

8   fair dealing and unlawful, unfair, and deceptive business practices. Plaintiffs

9   therefore seek compensatory and punitive damages, as well as equitable relief and

10   attorneys' fees.

11        13.    Indeed, in apparent response to complaints about AXA's rate increase,

12   NYDFS recently proposed a new regulation to protect policyholders "from

13   unjustified life insurance premium increases."[2] The regulation would give NYDFS

14   the opportunity to review potential rate increases by requiring life insurance

15   companies to notify NYDFS "at least 120 days prior to an adverse change in non-

16   guaranteed elements of an in-force life insurance or annuity policy."[3] The

17   regulation also would require insurers to notify policyholders "at least 60 days prior

18   to an adverse change in non-guaranteed elements of an in-force life insurance or

19   annuity policy."[4] In addition, the regulation would require insurers to "establish

20   board-approved criteria for determining non-guaranteed charges or benefits" and

21   would mandate a NYDFS review of "the anticipated experience factors and non-

22   guaranteed elements for existing policies whenever the non-guaranteed elements on

23   newly issued policies are changed."[5] The regulation defines experience factors as

24    

25   [2]  *See* Press Release, *NYDFS, DFS Proposes New Regulation to Protect New Yorkers from Unjustified Life Insurance Premium Increases* (Nov. 17, 2016),
26   http://www.dfs.ny.gov/about/press/pr1611171.htm.
  [3] *Id.*
27   [4] *Id.*
  [5] Life Insurance & Annuity Non-Guaranteed Elements §48.2, 11 NYCRR 48 (proposed
28    

ARENT FOX LLP
ATTORNEYS AT LAW
WASHINGTON

1   "investment income, mortality, morbidity, persistency, or expense that represents

2   the insurer's financial experience on a policy."[6] "Profit margin is not an experience

3   factor."[7]

4       14.     In announcing the proposed regulation in a press release dated

5   November 17, 2016, NYDFS Superintendent Maria Vullo declared that New York

6   "will not stand by and provide life insurers free reign to implement unjustified cost

7   of insurance increases on New Yorkers simply to boost profits."[8]

8       15.     An article in The Wall Street Journal published the same day notes that

9   although the regulation would apply only in New York, it "could be widely copied

10  by other insurance departments."[9]

11

12                          **THE PARTIES**

13      16.     Each plaintiff is a limited liability corporation organized under the

14  laws of the State of Washington and the managing member of each is the same

15  entity, a separate Washington LLC with its principal place of business in California.

16  The policies currently owned by Plaintiffs were issued in the state of California to

17  policy owners who resided in California at the time of issue.   All of the individual

18  members of both Plaintiffs, and of the LLC members, are residents of California or

19  Colorado.

20      17.     Upon information and belief, Defendant AXA Equitable Life

21  Insurance Company is a New York corporation with its principal place of business

22  in New York, New York, and AXA is authorized to do business in the State of

23

24  ─────────────────
    Nov. 17, 2016), http://www.dfs.ny.gov/insurance/r_prop/rp210txt.pdf.

25  [6] *Id.*
    [7] *Id.*

26  [8] Press Release, NYDFS, supra note 2.

27  [9] Leslie Scism, *New York Regulator Aims to Require Life Insurers Justify Higher Rates on Old Policies*, Wall St. J. (Nov. 17, 2016), http://www.wsj.com/articles/new-york-regulator-aims-to-

28  require-life-insurers-justify-higher-rates-on-old-policies-1479394201.

California and regularly conducts its business in the State of California, including within this judicial district.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the action involves parties of diverse citizenship, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

19.     This Court has personal jurisdiction over AXA because AXA regularly conducts and transacts business in this state, including having issued the life insurance policies in this First Amended Complaint in this state.

20.     Venue is proper pursuant to 28 U.S.C. §§ 1391(a)(1), (a)(2), and 1391(b) because AXA conducts business in this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district, including AXA's issuance of the policies at issue in this First Amended Complaint.

## FACTUAL BACKGROUND

### A.     Plaintiffs Are the Owners of AUL II Policies Subject to AXA's COI Increase

21.     Duffy is the owner and beneficiary of a $3 million AUL II Policy issued by AXA on February 4, 2005 and bearing policy number 154 231 577, a copy of which is attached hereto as **Exhibit 1** (the "Duffy Policy").

22.     Tull is the owner and beneficiary of a $5 million AUL II Policy issued by AXA on February 18, 2006 and bearing policy number 155 231 627, a copy of which is attached hereto as **Exhibit 2** (the "Tull Policy," and together with the Duffy Policy, the "Plaintiff Policies").

23.     AXA issued and delivered the Plaintiff Policies in the State of California, and they are subject to the cost of insurance rate increases.

24.     As is typical of universal life insurance policies, the Plaintiff Policies provide that they will remain in force as long as there are sufficient funds in the policy account each month to cover the monthly deductions described in the

Policies. The monthly deductions consist of a premium charge, an administrative charge, and a cost of insurance charge, plus charges for any policy riders. Any balance in the policy account that is left after the deductions are taken reflects the "Policy Account Value," which accrues interest at a rate that cannot be lower than the guaranteed minimum crediting rate of 3 percent for the Plaintiff Policies.  If in any month there are insufficient funds in the account to cover the deductions, the policy will enter a grace period, which is 61 days for the Plaintiff Policies. If additional premiums are not paid within the grace period, AXA will terminate, or lapse, the Plaintiff Policies.

25.     The largest and most significant charge under the AUL II Policies is the cost of insurance charge. This charge, also known as the mortality charge, reflects the price that AXA charges to cover the risk of death. The cost of insurance charge is determined by multiplying the cost of insurance rate times the net amount at risk. The net amount at risk is the death benefit minus the policy account value. The policy account value is deducted from the death benefit because, although the policy account value is part of the death benefit paid upon the insured's death, policyholders do not pay cost of insurance on this policy account value, which is the savings component of the AUL II Policies and not the "insurance."

26.     The cost of insurance rates under a policy are based initially on certain characteristics of the insured, including her or his gender, age, and underwriting class (*i.e.*, preferred plus, preferred, standard, and substandard classes). The cost of insurance rate increases every year as the insured ages.

27.     The Plaintiff Policies state that AXA "will determine cost of insurance rates from time to time" and that any change in the cost of insurance rates will be as described in the "Changes in Policy Cost Factors" provision.  The "Changes in Policy Cost Factors" provision provides:

> Changes in policy cost factors (interest rates we credit,
> cost of insurance deductions and expense charges) will be

on a basis that is equitable to all policyholders of a given class, and will be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses.

28.     The Plaintiff Policies also contain a promise to pay interest on the policy account value.  Although AXA sets the rate of interest, the rate can never be lower than the guaranteed minimum credit rate, which is 3 percent for the Plaintiff Policies.  Furthermore, the Plaintiff Policies expressly state that any change in policy cost factors, which includes changes in cost of insurance rates, can "never result in an interest crediting rate that is loser than" the guaranteed minimum crediting rate.

29.     Accordingly, among many other things, under the plain terms of the Plaintiff Policies, any change in the cost of insurance rates (a) can only be "based on [AXA's] reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses"; and (b) must be "equitable to all policyholders of a given class"; and (c) cannot result in a crediting rate lower than the guaranteed minimum crediting rate.

**B.     AXA Raises Cost of Insurance Rates Solely on the Discriminated Group's Policies**

30.     In October 2015, AXA began notifying the Discriminated Group that it was raising the cost of insurance rates on their AUL II Policies, including the Plaintiff Policies (the "Notice Letters").  The Notice Letters stated that AXA was "adjusting your universal life insurance policy in a way that will increase the monthly cost-of-insurance (COI) deductions from your policy and which is likely to require payment of additional premium to help ensure that your policy will perform as previously illustrated."  The Notice Letters further stated that AXA has "reviewed our mortality and investment income expectations for Athena Universal Life II policies and [has] determined that they are less favorable than was

anticipated when the current schedule of COI rates was established," which is consistent with other statements AXA had made publicly regarding the purported bases for the rate increase.[10]

31.     The Notice Letters did not tell Plaintiffs how much the rate increase would be or explain how its mortality and investment income assumptions had changed. Nor did they say what policies or policyholders were subject to a rate increase.  The range of the increase in cost of insurance rate was later calculated to be between approximately 35 percent to as high as 65 percent.

32.     In addition to the Notice Letters, a "Frequently Asked Questions" ("FAQ") document that AXA released to brokers and agents disclosed that the COI rate increase was targeted solely at the Discriminated Group.[11] Although the FAQ stated that "the impact of changes in our future mortality and investment income expectations was most pronounced for th[is] class of policies," AXA did not explain how or why its changes were "most pronounced" for this group of policies.[12]

33.     To date, AXA has not advised the public, and upon information and belief, nor any of its policyholders the reasons for the cost of insurance increases.

34.     On February 10, 2017, counsel for Plaintiffs made an inquiry to the California Department of Insurance into AXA's cost of insurance increases, but Plaintiffs have yet to receive a substantive response.  Because no one but AXA and its regulators have this information, AXA's refusal to provide the information has prevented policyholders like Plaintiffs from verifying the accuracy of AXA's representations that its rate increase is justified by changes in assumptions as to mortality and investment income.  It is likely for this reason that NYDFS proposes

---

[10] *See also* AXA Equitable Life Ins. Co., Quarterly Report (Form 10-Q) 15, 77 (Nov. 11, 2016); *FAQs: Athena Universal Life II COI Rate Change* at 2, available at http://premierbrokerage.com/wp-content/uploads/AXA-COI-Increase.pdf (last visited Apr. 7, 2017).
[11] *FAQs: Athena Universal Life II COI Rate Change, supra* note 11, at 2.
[12] *Id.*

ARENT FOX LLP
ATTORNEYS AT LAW
WASHINGTON

its new regulation, which would require life insurance companies like AXA to notify NYDFS and policyholders in advance of any adverse change in the non-guaranteed elements of an in-force life insurance policy and would mandate regulatory review of the anticipated experience factors, such as mortality and investment income.

35.     Regardless, it is apparent that AXA's rate increase breaches the terms of the Plaintiff Policies in at least four ways. *First*, the rate increase is not "equitable to all policyholders of a given class." *Second*, the rate increase is not "based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses." Rather, Plaintiffs are informed and believe, and on that basis allege, that in raising COI rates, AXA considered factors that AXA cannot consider under the Plaintiff Policies. *Third*, the rate increase impermissibly attempts to circumvent the minimum guaranteed crediting rate under the Plaintiff Policies. *Fourth*, the rate increase breaches the implied covenant of good faith and fair dealing that exists in every insurance contract.

**C.     The Rate Increase Is Not Equitable to All Policyholders in a Class**

36.     The only "class" referred to in the Plaintiff Policies is the "Rating Class" or the "class of risk."  In the AUL II Product Guide, which AXA distributed to its sales force, AXA refers to Rating Classes as "Underwriting Classes," but they appear to refer to the same grouping of policies.  A copy of the AUL II Product Guide is attached hereto as **Exhibit 3**.

37.     The Underwriting Classes are (i) Preferred Plus Non-Tobacco User; (ii) Preferred Non-Tobacco User; (iii) Preferred Tobacco User; (iv) Standard Non-Tobacco User; (v) Standard Tobacco User; and (vi) Substandard letter rating classes C, D, E, and F, Non-Tobacco and Tobacco User. These classes represent a range of mortality risks, with Preferred Plus representing the lowest mortality risk to AXA.

38.     Issue age and face amount are not characteristics of the Rating or Underwriting Class, although only certain issue ages qualify for a particular

Underwriting Class. For example, Preferred Plus is limited only to issue ages of 18 to 80, while Preferred is available to anyone from age 0 to 85. Thus, the Preferred and Preferred Plus Underwriting Classes consist of policies with issue ages 70 and above as well as AUL II Policies with issue ages 69 and below. These Underwriting Classes also consist of AUL II Policies with face amounts of $1 million and above as well as AUL II Policies with face amounts of $999,999 and below.

39.     AXA's rate increase violates the provision that any change in cost of insurance rates be equitable to all policyholders within a class because the rate increase applies only to some, rather than all, members of an Underwriting Class (those with issue ages of 70 and above and face amounts of $1 million and above). For example, some members of the Preferred and Preferred Plus rating classes received a cost of insurance rate increase while others did not. The same holds true for every other Rating or Underwriting Class.

40.     There also is no equitable or actuarial basis for singling out policies with issue ages of 70 and above and face amounts of $1 million and above. This is particularly true with respect to the alleged adverse changes in AXA's investment income expectations. If, as AXA contends, it expects to receive less investment income due to lower interest rates, it would expect to receive less investment income for all policies regardless of their issue ages or face amounts. Indeed, interest rates would have a greater impact on policies with *lower* issue ages, not *higher* issue ages, because AXA would expect to realize the shortfall in expected investment income over the course of many more years for policies with lower issue ages. Although in a different context, even AXA itself has recognized this generally applicable principle.  In the AUL II Product Guide, AXA expressly acknowledges that interest rate assumptions have a greater impact on policies issued to younger insureds (*i.e.*, those whose policies will be longer in duration). It states:

> Note that interest rates credited on a UL policy are *less*

1        *important* in the sales illustration on a 75-year-old than

2        they are on a 35-year-old since the illustration generally

3        shows payments and policy values to age 120, (although

4        the focus is often on age 100) and compounding over 85

5        years makes much more of a difference than over 45

6        years. ***Thus, there is relatively less interest rate risk on***

7        ***Athena II at older ages than at younger ages.***

8      41.     Nor does it appear based on A/E ratios that the AUL II Policies have

9 experienced worse mortality for policies with issue ages of 70 and above and face

10 amounts of $1 million and above. The A/E ratio is the actual to expected ratio, and

11 reflects an insurance company's actual experience compared to its expected

12 experience. Upon information and belief, AXA's A/E mortality ratios for policies

13 with issue ages of 70 and above and face amounts of $1 million and above is ***lower***

14 ***than*** the A/E mortality ratios for policies with issue ages of 69 and below and face

15 amounts of $999,999 and less. In other words, upon information and belief, AXA's

16 mortality experience for the Discriminated Group has been more favorable than it

17 has been for AXA's other AUL II Policies, which were not subject to the cost of

18 insurance rate increase.

19      42.     Thus, not only is AXA's rate increase not equitable to all

20 policyholders within a given class, the rate increase appears to target a group of

21 policies that have been ***more favorable to AXA*** than those that did not receive a rate

22 increase. For this and other reasons, Plaintiffs believe that AXA had other

23 undisclosed and improper motives for targeting the Discriminated Group for the

24 rate increase.

25      43.     Specifically, Plaintiffs are informed and believe, and on that basis

26 allege, that AXA identified the Discriminated Group as consisting largely of

27 investor policyholders that acquired their AUL II Policies in or through the

28 secondary market for life insurance. Such policyholders, like Plaintiffs, have

generally paid only enough premiums to cover their monthly policy charges and chosen not to invest in the AUL II policy account, which has resulted in less premium revenue for AXA and lower policy account values. The Plaintiff Policies, however, do not permit AXA to raise cost of insurance rates based on policy account values or how much policyholders choose to fund their policies. Indeed, by penalizing policyholders for exercising their contractual right to fund their policies as they choose, AXA has also breached the implied covenant of good faith and fair dealing.

### D.    The Rate Increase Is Not Justified by Changes in Reasonable Assumptions as to Mortality and Investment Income

44.    The Plaintiff Policies state that AXA may base a change in cost of insurance rates only on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses. These are the only six assumptions that AXA may consider, and its assumptions must be reasonable. Furthermore, to be based on AXA's reasonable assumptions, the changes in cost of insurance rates must correspond with the magnitude of the changes in AXA's assumptions.

45.    Here, AXA has cited only two assumptions in support of the rate increase—mortality and investment income. Neither of these assumptions, however, supports AXA's rate increase.

**Mortality**

46.    *First*, as to mortality, it is well known in the life insurance industry that over the past decade, mortality has improved, not worsened, and people are living much longer than anticipated several years ago when AXA priced the AUL II Policies. For example, in 2015, the National Center for Health Statistics reported "[s]ignificant decreases in mortality in 2014 compared with 2013" and observed

that this year-to-year improvement was "consistent with long-term trends."[13]
"Although year-to-year changes are usually relatively small," explained the
National Center for Health Statistics, "the age-adjusted death rate in the United
States decreased 16.6% between 2000 (869.0) and 2014 (724.6)."[14] This "longterm
trend" of improving mortality is also evidenced by the release of several new
mortality tables over the past two decades that would, if anything, support a
decrease in cost of insurance rates, not an increase in rates as high as 68%.

47.     Specifically, in 2001, the Society of Actuaries' ("SOA") and the
American Academy of Actuaries ("AAA") produced the 2001 Commissioner's
Standard Ordinary ("CSO") Table, which replaced the previous 1980 CSO Table to
reflect significant improving mortality, especially at older ages. The maximum cost
of insurance rates allowed under the AUL II Policies, however, are based on the
older 1980 CSO Table, not the newer 2001 CSO Table.[15] The SOA also is currently
investigating an update of the 2001 CSO Table, and a 2015 investigative report by
the SOA showed significant reductions in insurance company reserves compared to
the 2001 CSO Table due to mortality improvements since 2001. In addition, in
2008, just four years after AXA priced the AUL II Policies, the SOA released a
2008 Valuation Basic Table ("VBT") that reflected significant mortality
improvements compared to prior tables, especially at older ages.  In 2014, the SOA
released the 2014 VBT, which showed overall mortality improvement from the
2008 VBT.

48.     These new mortality tables demonstrate that since AXA originally
priced the AUL II Policies (in or around 2004), mortality has improved, not

---

[13] Murphy, *supra* note 1, at 5.
[14] *Id.*
[15] AXA has defended its COI rate increase by claiming that the new rates remain lower than the maximum rates under the policies. Those maximum rates, however, are based on the outdated 1980 CSO table and therefore say nothing about whether AXA's new rates are justified in light of its actual mortality experience.

worsened, and this change in mortality would support a decrease, not increase, in cost of insurance rates.

49.     Plaintiffs also are informed and believe, and on that basis allege, that AXA adjusted the cost of insurance rates for universal life insurance at least five times between 2004 and 2013, updating its mortality assumptions as needed, and AXA never disclosed that it had suffered adverse mortality to justify a change in cost of insurance rates on its in-force AUL II Policies. Indeed, upon information and belief, as late as February 25, 2015, AXA represented to NYDFS that its current experience for factors underlying any nonguaranteed elements, including mortality, was not different from its anticipated experience. Yet just seven months later, AXA purported to have discovered adverse mortality experience justifying a cost of insurance rate increase of as much as 68%. It is simply implausible that in just seven months, AXA went from anticipating no changes in mortality to mortality changes justifying a 68% increase in the cost of insurance rates.

**Investment Income**

50.     ***Second***, as to investment income, upon information and belief, AXA likewise represented to NYDFS as late as February 25, 2015 that its current experience for factors underlying any nonguaranteed elements, including investment income, was not different from its anticipated experience, and it is highly implausible that AXA only discovered an adverse change in investment income justifying a rate increase of as much as 68% just seven months later when it notified the Discriminated Group it was raising their cost of insurance rates.

51.     In any event, even if lower interest rates may impact AXA's cost of providing insurance, they would not justify a rate increase as high as 68% because interest rates should be a relatively minor factor in calculating AXA's cost of insurance (and, consequently, its cost of insurance rates).

52.     To begin with, as it relates to cost of insurance rates, "investment income" can only refer to the investment income that AXA earns (or expects to

earn) on its profits from providing insurance, and not on funds in its policyholders' accounts. As mentioned above, a universal life insurance policy consists of two distinct components—(a) the life insurance, or "mortality," component; and (b) the accumulated value, or "savings," component. Although a life insurance company may earn investment income from both of these components, it can only consider investment income on the mortality component when determining the cost of insurance. The investment income it earns from investing funds in policyholder accounts (i.e., the savings component), on the other hand, is only relevant to setting the interest rate credited to those accounts, and is not relevant to determining the cost of insurance. This is because the cost of insurance charge is the mortality charge. It is intended to cover the risk of the insured's death, not the investment income risk associated with policyholder accounts (and guaranteeing policyholders a minimum interest rate on their policy accounts).

53.     The cost of insurance charge includes an expected profit over the insurance company's expected mortality. The insurance company then expects to invest this profit and earn investment income on it. The company then factors this profit and the investment on this profit in setting the cost of insurance rates. Lower interest rates may result in lower investment income, but lower rates would not result in a loss unless the insurance company's investments had a negative return. But this is highly unlikely to occur because most life insurance companies invest primarily in fixed-income securities, such as bonds. Thus, to the extent AXA is raising COI rates because it is earning less investment income on its mortality profits as a result of low interest rates, it is highly unlikely that this lower investment income would justify a rate increase, much less one as high as 68%.

54.     To illustrate this, assume AXA's COI rate contemplated a 20% mortality profit. For every $120 in COI charges received in a year, AXA would expect to pay out $100 in claims, leaving $20 to invest. If it assumed it would earn 5% on the profit of $20 in that year, it would expect to earn $1.00 of investment

income. If it now expects to earn 1% instead of 5%, the investment income would drop to $0.20 instead of $1.00. But this 80% drop in investment income would not translate to an 80% COI rate increase because it does not capture the $20 mortality profit. In other words, AXA is earning $20.20 instead of $21.00 on the mortality component, which is a difference of less than 4%, assuming mortality is as expected. If AXA experienced favorable mortality, that favorable mortality experience should also offset the cost associated with the lower than expected investment income. Although this is a very rudimentary example, it illustrates how a decline in interest rates is not likely to result in a COI rate increase as high as 68%.

55.     As to the investment income on the savings component of a universal life insurance policy, a life insurance company expects to earn a spread on the funds that policyholders maintain in their policy accounts. That is, if the life insurance company is earning 8% on its investments on policyholder accounts, it may credit policyholders 7% and earn a spread of 1%. If interest rates are low and the company is earning only 5% on its investment on policyholder accounts, it may lower the crediting rate to 4% and still earn a 1% spread. Thus, even if AXA could consider interest rates on the policy account values (which it cannot), this would not justify a COI rate increase, but only a change in the crediting rate.

56.     However, if AXA expects to earn only 3% on its investments, AXA cannot reduce the crediting rate to 2% because this rate would be below the guaranteed minimum crediting rate. Nor, however, can AXA attempt to offset this loss by raising COI rates. If it could, the cost of insurance would not be a mortality charge, but a way for AXA to guarantee its profitability on the AUL II Policies by transferring to policyholders all risk under the policies, including the crediting rate risk on policy account values. This would render the guaranteed minimum crediting rate meaningless.

57.     Furthermore, even if AXA is properly considering only investment income on mortality, to the extent AXA is raising COI rates to achieve its original profit expectations, the rate increase is improper because AXA cannot raise COI rates simply to guarantee itself its original profit expectations. As NYDFS has said, life insurance companies do not have free reign to raise COI rates "simply to boost profits" because profit margin is not an experience factor.[16] Moreover, as discussed above, the impact of lower interest rates can and must be distributed *equitably* among all policyholders and should not be borne by only the Discriminated Group.

58.     In light of this, and given the magnitude of AXA's rate increase, Plaintiffs are informed and believe, and on that basis allege, that AXA did not base its rate increase on permissible factors, but on impermissible factors such as how much policyholders have chosen to fund their policies and AXA's expected investment income on policy account values. Plaintiffs also are informed and believe, and on that basis allege, that AXA has imposed the rate increase, not because its mortality and investment income experience has been unfavorable enough to require a COI rate increase, but solely to boost its profits. Profit is not a factor that AXA can consider in changing COI rates. Furthermore, using COI rates to guarantee AXA's original profitability assumptions, and thereby placing its interest in maximizing gains over the rights of policyholders, would constitute a breach of the implied covenant of good faith and fair dealing.

59.     In sum, by drastically raising cost of insurance rates only on the Discriminated Group, AXA seeks to force Plaintiffs and other members of the Discriminated Group either to (a) pay exorbitant premiums that AXA knows would no longer justify the ultimate death benefits or (b) lapse or surrender their policies, thereby forfeiting the premiums they have paid over the last decades. AXA, in turn, will make a huge profit—either through higher premium payments or by

---

[16] Press Release, NYDFS, *supra* note 2.

ARENT FOX LLP
ATTORNEYS AT LAW
WASHINGTON

eliminating a large group of policies (through lapses or surrenders) and keeping the premiums that have been paid to date. Indeed, as noted above, AXA realized an increase of $46 million to net earnings in just the first nine months of 2015 alone.

**E.   The Rate Increase Is an Impermissible Attempt to Circumvent the Guaranteed Minimum Crediting Rate**

60.   As explained above, under the express terms of the AUL II Policies, a policyholder has the right to pay just enough premiums to cover the monthly policy charges. If the policyholder contributes more than needed to cover the monthly charges, leaving a balance remaining in the policy account, the AUL II Policies provide that the balance will accrue interest at a rate no lower than the guaranteed minimum crediting rate. The guaranteed minimum crediting rate provided for under the Plaintiff Policies is 3 percent.

61.   Not only do the AUL II Policies state that the crediting rate will never be lower than the guaranteed minimum, the policy cost factors section also specifically states that any change in any policy cost factors, which includes cost of insurance rates, "will never result in an interest crediting rate that is lower than that guaranteed in the polic[ies.]"

62.   AXA admits that it based its rate increase on less favorable investment income expectations. To the extent AXA considered investment income it earns on funds in policyholder accounts, the rate increase also violates the AUL II Policies' provision that any change in COI rates will never result in an interest crediting rate that is lower than that guaranteed in the policies. This is evident because if AXA's investment income earned on funds in policyholder accounts did not drop near or below the guaranteed minimum crediting rate, AXA could simply address the change in interest rates by lowering the crediting rate on policy accounts. But if AXA is raising COI rates instead of lowering the crediting rate, this presumably is because lowering the crediting rate would not be sufficient for AXA—because it is earning investment income near or below the guaranteed minimum crediting rate

(thus, reducing its originally anticipated spread). By raising COI rates to account for this, however, AXA is trying to do indirectly what it cannot do directly: it is using COI rates to achieve a crediting rate that is lower than the guaranteed minimum crediting rate, which is precisely what the AUL II Policies prohibit when they say that any change in policy cost factors "will never result in an interest crediting rate that is lower than that guaranteed" in the policies.

63.    In short, AXA is trying to take the "guarantee" out of the guaranteed minimum crediting rate. By depriving policyholders of the right to the guaranteed minimum crediting rate, AXA has breached not just the express terms of the AUL II Policies, but also the implied covenant of good faith and fair dealing.

## COUNT I

### (Breach of Contract – Express)

64.    Plaintiffs reallege the allegations contained in paragraphs 1 through 63, inclusive, as if set forth fully herein.

65.    The Plaintiff Policies are binding and enforceable contracts.

66.    Defendant materially breached Plaintiffs' policies in several respects, including but not limited to the following:

a.    By increasing the cost of insurance rates on a basis that is not equitable to all policyholders in a given class and instead specifically targeting the Discriminatory Group;

b.    By increasing the cost of insurance rates on a basis other than "reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses"; and

c.    By imposing excessive cost of insurance rates.

67.    Plaintiffs have performed all of their obligations under the Plaintiff Policies, except to the extent that their obligations have been excused by Defendant's conduct as alleged herein.

68.     As a direct and proximate cause of Defendant's material breaches of the Policies, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.

<u>**COUNT II**</u>

**(Implied Covenant of Good Faith and Fair Dealing – Contractual & Tortious Breach)**

69.     Plaintiffs reallege the allegations contained in paragraphs 1 through 63, inclusive, as if set forth fully herein.

70.     The Plaintiff Policies are binding and enforceable contracts.

71.     Each of the Plaintiff Policies includes an implied covenant that Defendant will act in good faith and deal fairly with Plaintiffs.

72.     Defendant materially breached the Plaintiff Policies in several respects, including but not limited to the following:

a.      By charging excessive cost of insurance rates, thereby denying Plaintiffs the benefit of its actual policy account values;

b.      By increasing the cost of insurance rates on policyholders who exercised their contractual right to pay only enough premiums to cover a policy's monthly charges and, in effect, penalizing policyholders for and deterring policyholders from exercising their contractual rights, thereby frustrating their right to one of the essential benefits of their policies;

c.      By targeting Plaintiffs and the Discriminated Group for the cost of insurance rate increase when there is no reasonable actuarial basis for doing so;

d.      By considering investment income that it earns on policyholder accounts, as opposed to investment income only from its mortality profits, in raising cost of insurance rates;

e.  By increasing COI rates in an attempt to restore AXA's original expected profitability for the AUL II Policies at the policyholders' expense;

f.  By increasing COI Rates in order to circumvent the minimum guaranteed crediting rate under the AUL II Policies;

g.  By attempting to force Plaintiffs and other members of the Discriminated Group either to (a) pay exorbitant premiums that AXA knows would no longer justify the ultimate death benefits or (b) lapse or surrender their policies, thereby forfeiting the premiums they have paid to date; and

h.  Failing to provide any meaningful disclosures about the cost of insurance rate increases, including refusing to provide or make available the documents that Defendant contends support its alleged bases for raising the cost of insurance rates.

73.  Plaintiffs have performed all of their obligations under the policies, except to the extent that their obligations have been excused by Defendant's conduct as alleged herein.

74.  Defendant's breaches were conscious and deliberate acts, which were designed to and which did unfairly frustrate the agreed common purposes of the Plaintiffs' policies and which disappointed Plaintiffs' reasonable expectations by denying Plaintiffs the benefits of the Plaintiff Policies.

75.  As a direct and proximate cause of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest. Furthermore, AXA's conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

## COUNT III

### (Declaratory Relief)

76.    Plaintiffs reallege the allegations contained in paragraphs 1 through 63, inclusive, as if set forth fully herein.

77.    For reasons including, but not limited to, those stated herein, there exists an actual dispute and controversy between Plaintiffs and Defendant concerning Plaintiffs' rights and Defendant's obligations under the Plaintiff Policies, including but not limited to how Defendant must implement any change in the cost of insurance rates and under what circumstances Defendant may change the cost of insurance rates.

78.    Accordingly, Plaintiffs seek a declaration (a) that Defendant's cost of insurance rate increase is improper under the Plaintiff Policies and that any excess premiums received must be returned or the policies' account values recalculated according to the original cost of insurance rates; (b) that Defendant's purported "class" of policies defined by issue age and face amount are improper classes; and (c) setting forth the specific guidelines that govern the factual circumstances under which Defendant can raise the cost of insurance rates.

79.    Such a declaration will help prevent or limit any future controversies under the Plaintiff Policies by providing guidance as to when and how Defendant can change the cost of insurance rates on its in-force AUL II Policies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

### On the First Count

1.    For compensatory damages in an amount to be determined at trial;

2.    For an award of pre-judgment and post-judgment interest;

3.    For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.    For such other and further relief as the Court may deem proper.

### On the Second Count

1.     For compensatory damages in an amount to be determined at trial;

2.     For punitive damages in an amount to be determined at trial;

3.     For an award of pre-judgment and post-judgment interest;

4.     For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

5.     For such other and further relief as the Court may deem proper.

### On the Third Count

1.     For a declaration (a) that Defendant's cost of insurance rate increase is improper under the Plaintiff Policies and that any excess premiums received must be returned or the policies' account values recalculated according to the original cost of insurance rates; (b) that Defendant's purported "class" of policies defined by issue age and face amount are improper classes; and (c) setting forth the specific guidelines that govern the factual circumstances under which Defendant can raise the cost of insurance rates;

2.     For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

3.     For such other and further relief as the Court may deem proper.

Dated:  April 7, 2017              Respectfully submitted,

ARENT FOX LLP


By:   */s/ Franjo M. Dolenac*
Michael Cryan
Franjo M. Dolenac

Attorneys for Plaintiffs
THE DUFFY 2004 LLC
and THE TULL 2006 LLC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:  April 7, 2017

Respectfully submitted,

ARENT FOX LLP


By:   */s/ Franjo M. Dolenac*
Michael Cryan
Franjo M. Dolenac

Attorneys for Plaintiffs
THE DUFFY 2004 LLC
and THE TULL 2006 LLC

CASE NO. 2:17-cv-00996-DSF-RAO

AFDOCS/14829766.1

- 27 -

FIRST AMENDED COMPLAINT